[Cite as *State v. Adams*, 2024-Ohio-2487.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

BENNIE L. ADAMS,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 23 MA 0086

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2007 CR 01261

**BEFORE:**
Carol Ann Robb, Mark A. Hanni, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Gina DeGenova,* Mahoning County Prosecutor, *Atty. Ralph M. Rivera,* Chief*,* Criminal Division, *Atty. Edward A. Czopur,* Assistant Prosecutor*,* Mahoning County Prosecutor's Office for Plaintiff-Appellee and

*Atty. Kimberly Rigby*, Managing Counsel, Death Penalty Dept, *Atty. Renee Severyn*, Assistant State Public Defender, Office of the Ohio Public Defender for Defendant-Appellant.

Dated:  June 27, 2024

**Robb, P.J.**

**{¶1}** Appellant, Bennie L. Adams, appeals the trial court's July 5, 2023 judgment concluding Appellant's claims of juror bias were unsubstantiated after a *Remmer*[1] hearing. Appellant argues the trial court erred by excluding expert testimony, erred in its credibility determinations, and abused its discretion by failing to grant him a new trial. For the following reasons, we affirm.

<u>Statement of the Facts and Case</u>

**{¶2}** Appellant was convicted of aggravated murder following an October 22, 2008 jury trial. The jury also recommended a death sentence on October 29, 2008. The underlying felonies of rape, aggravated burglary, aggravated robbery, and kidnapping were dismissed on statute of limitations grounds since the crimes had occurred in December of 1985. Appellant was identified as the perpetrator in 2007 after new DNA technology was used. *State v. Adams*, 7th Dist. Mahoning No. 08 MA 246, 2011-Ohio-5361, ¶ 1-13, aff'd in part, vacated in part, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127.

**{¶3}** In Appellant's direct appeal, this court affirmed his conviction and death sentence. *Id.* On appeal, the Ohio Supreme Court affirmed the conviction, but vacated the death sentence and remanded to the trial court for resentencing. The Ohio Supreme Court set out the underlying facts and history of this case in *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 3-73, which we do not repeat herein.

**{¶4}** Appellant filed a motion for postconviction relief, which the trial court overruled. The court found his fourth claim for relief, and the jurors' knowledge of his prior rape conviction, was based on the affidavit of juror number 44, T.M. This juror stated in his affidavit that after the jury reached its verdict and recommended a death sentence, another juror told T.M. that Appellant had been previously incarcerated for rape.

---

[1] "[T]he remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215, 102 S.Ct. 940 (1982). The hearing is commonly referred to as a *Remmer* hearing based on *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450 (1954).

{¶5} In response, the state submitted the affidavit of another juror, who averred that the jurors did *not* know the reason for Appellant's prior incarceration until *after* they reached a guilty verdict and recommended death. The court concluded Appellant failed to establish prejudice because neither affidavit stated the jurors knew about the reason for his prior prison term at a time when it could have affected their decisions. Thus, the trial court denied this claim for relief. (Sept. 25, 2018 Judgment.)

{¶6} We affirmed the denial of postconviction relief. We found the trial court did not abuse its discretion by finding Appellant failed to produce evidence that any of the jurors knew of his rape conviction before reaching their verdict. *State v. Adams*, 7th Dist. Mahoning No. 18 MA 0116, 2019-Ohio-4090, ¶ 32-34. The Ohio Supreme Court did not accept and review the case on appeal, and the U.S. Supreme Court denied certiorari. *State v. Adams*, 157 Ohio St.3d 1539, 2020-Ohio-122, 137 N.E.3d 1214; *Adams v. Ohio*, 141 S.Ct. 332, 208 L.Ed.2d 72.

{¶7} In February 2023, the United States District Court for the Northern District of Ohio issued a conditional writ of habeas corpus. The Northern District held that Adams may apply for release from custody unless the state holds a *Remmer* hearing within 150 days. *Adams v. Eppinger*, N.D.Ohio No. 4:21-CV-00158, 2023 WL 1969740, *12.

{¶8} It explained in part: "Adams makes one good claim. He offers sworn affidavit evidence that deliberating jurors somehow knew about Adams's conviction of a separate rape, kidnapping and robbery. * * * [T]he Court finds that Adams had the right to have this issue examined." *Id.* at *1.

{¶9} In March of 2023, the trial court held a telephone hearing in Appellant's 2007 criminal case. Pursuant to the mandate of the federal court, the trial court set a *Remmer* hearing for two consecutive dates in June of 2023 and instructed the parties to file briefs. (March 16, 2023 Judgment.)

{¶10} The state moved to exclude the testimony and report of Appellant's expert, a trial consultant. It urged the court to find Appellant's pretrial publicity argument had been thoroughly vetted in his direct appeal and in his appeal to the Ohio Supreme Court. Thus, the state contends the argument about the extent of pretrial publicity was barred by res judicata. In addition, the state also argued Appellant's expert opinion was irrelevant and inadmissible. (June 1, 2023 Motion in Limine.)

{¶11} Appellant opposed and argued his expert's report addressed both aspects of the required *Remmer* hearing, i.e., when the jurors learned about Appellant's prior rape conviction and the impact the knowledge may have had on the jurors. Appellant alleged he was not advancing a general pretrial publicity argument but instead seeking to include his expert's testimony and report in an effort to show how and when the jurors learned about the prior conviction. Appellant also sought to introduce his expert's testimony in an effort to show the impact this information may have had on the jurors and their deliberations. He sought to introduce expert testimony about how knowledge of the prior rape conviction prejudiced him. (June 7, 2023 Response.)

{¶12} The trial court partially granted the motion and overruled it in part, noting its decision was preliminary and reflected its anticipated treatment of the issues at the hearing. The court explained:

> [t]o the extent that Dr. Edelman seeks to testify as to the general effect of pre-trial publicity on the venire, the motion is hereby granted. Any arguments and/or testimony with respect to the general effect of pre-trial publicity * * * is barred by res judicata. However, testimony regarding the psychology about how knowing details of Adams' prior convictions affected jury deliberations * * * is potentially relevant and would address the second requirement of this hearing—the impact any prior conviction knowledge may have had on the juror(s). * * *
>
> Dr. Edelman's testimony would be both unnecessary and irrelevant if it is found that none of the jurors knew of Adams' prior conviction before rendering a guilty verdict.

(June 8, 2023 Judgment.)

{¶13} Thirteen jurors testified at the hearing, two testified via deposition, and one alternate juror was deceased at the time.

{¶14} The first juror to testify was E.T. He was asked on direct what news sources he followed at the time of Appellant's trial. The defense objected, but the question was permitted. E.T. said he generally followed the national news. He denied remembering any discussion between the jurors about whether Appellant "had a prior [criminal] record."

E.T. denied knowing Appellant had a prior rape conviction. He did not go out to dinner with other jurors after the trial concluded. (Tr. 9-13.)

{¶15} Juror D.F. also testified. She was asked whether she knew Appellant was in prison at the time of trial or before. D.F. recalled how Appellant's attorneys argued that he was a "model prisoner" and took classes. However, D.F. denied wondering why Appellant was in prison or knowing why he was previously incarcerated. She did not remember any of her fellow jurors saying they knew why he was in prison. D.F. then said she learned Appellant had a prior rape conviction and sentence about one month before the *Remmer* hearing when she met with prosecutors. (Tr. 19-21.)

{¶16} Juror D.C. was called to testify. D.C. generally recalled her time as a juror. She remembered there were two different deliberations, one for guilt and one for sentencing. She was asked whether she followed the news in 2008. She said no. D.C. was asked to read one of the questions in her juror questionnaire in which she said she read the local newspaper at the time. When asked if this was accurate, she responded that she looked at the comics and the advertisements. She denied reading the news. D.C. said she did not learn any details about Appellant's case, and no one told her about Appellant or the case during the trial. D.C. was not aware at any point during the guilt or sentencing phases that Appellant had a prior rape conviction. She did not go to eat at a restaurant with her fellow jurors. (Tr. 29-36.)

{¶17} R.C. was also a juror for Appellant's case. R.C. testified that she remembered both phases of the trial and being sequestered. She denied learning about why Appellant was in prison at the time of the trial. However, after they returned the verdict and concluded the penalty phase, she remembers a detective spoke to them and thanked the jurors. He also informed the jurors they did not have to speak to the media. R.C. remembers going to get a drink with other jurors after the case concluded. She does not remember any of them talking about Appellant's prior conviction. She did not know he had a prior rape conviction. (Tr. 43-49.)

{¶18} R.C. II testified and confirmed he was one of the alternate jurors on Appellant's case. The trial court sustained the state's objection when R.C. II was asked about what news sources he followed at the time of trial. The court stated in part: "with regard to pretrial publicity, I don't want any testimony with regard to that. * * * [A]ll issues

regarding pretrial publicity have already been appealed and ruled on." Appellant's counsel then asked R.C. II whether he was "accidentally exposed to any news stories about the case" during Appellant's trial. The state objected, and the court sustained the objection. (Tr. 63.) R.C. II first learned Appellant had a prior rape conviction and sentence when he was contacted in regard to the *Remmer* hearing. At the time of trial, he remembers eating with other jurors in the courtroom. (Tr. 53-72.)

{¶19} P.B. was also an alternate juror for Appellant's trial. P.B. denied hearing about the case before she was called to be a juror. The state objected to this question, but it was permitted. P.B. likewise denied learning information about Appellant's background and past before the trial. She now knows Appellant had a prior rape conviction at the time of trial, but at the time of trial, she did not know this fact. She denied hearing other jurors talk about his past conviction. The only meal P.B. remembered eating with the other jurors was in the courtroom. (Tr. 75-84.)

{¶20} M.C. testified live at the hearing via Zoom. She was asked if she knew that Appellant had a prior rape conviction during his trial, and she said no. M.C. learned about this prior conviction "when everything was over." Another juror, a white female, told her about it. M.C. agreed the juror room was not a large room, and she denied hearing one juror telling another that Appellant had raped someone else before. (Tr. 87-97.)

{¶21} J.J. testified that he was the foreperson during Appellant's trial. He denied knowing about Appellant's prior rape conviction at the time of his trial. J.J. said "if anybody said it [that the jurors knew about the prior rape during the trial], they are mistaken about the timeline * * *." Instead, J.J. stated after the penalty phase was complete, either the judge or prosecutor told the jury that Appellant had a prior rape conviction. J.J. says they were told this information after recommending the death sentence to "put their mind at ease." He recalled feeling shocked to learn this and wondered why he did not have this information during the case. J.J. also remembered Appellant's character witness was from the jail, so the jurors were aware Appellant likely had a criminal past. J.J. went to a restaurant with other jurors after the trial concluded. He described it as a large and noisy place. J.J. denies silencing or attempting to silence discussion about the trial at the restaurant. (Tr. 99-117.)

{¶22} T.M. testified at the hearing via Zoom. He was one of the jurors for Appellant's trial. He was the source of the affidavit stating other jurors knew about Appellant's prior rape conviction during this trial.

{¶23} T.M. said when he recently spoke with the prosecution to prepare for the *Remmer* hearing, the representative advised T.M. that a prosecutor had informed the jury about Appellant's prior rape conviction after the trial had ended. T.M. then stated "obviously I wasn't in the jury room when this happened because I don't remember that." T.M. said it was obvious Appellant had been in prison before based on witnesses' testimony presented during the penalty phase of trial. (Tr. 121-126.) T.M. was then asked the following by Appellant's attorney:

> Q Did some of your fellow jurors know that Mr. Adams was previously convicted of rape * * * during trial?
>
> A Yes.
>
> Q How many of your fellow jurors knew about that?
>
> A To my knowledge, three.

(Tr. 127-128.) When asked about what fellow juror D.G. told him, T.M. stated in part:

> It was obvious to her and the other jurors that I was struggling with the death penalty, and after * * * we were having lunch[,] I believe in the courtroom, and she came up and sat next to me and told me if it makes me feel any better, [Appellant] had been in jail for a number of years on another rape charge * * * she was trying to help me * * * because she saw how much I struggled with this.

He said D.G. was the only black juror. T.M. also said this conversation occurred after the jury had already voted for death, but before they released their decision, so they could get one last "free lunch," which they ate in the courtroom. (Tr. 127-129.)

{¶24} T.M. said he learned about the prior rape conviction before the death sentence was announced, but after he already voted in favor of it. Thus, he said this information did not affect his decision. Despite knowing this extraneous information, T.M. did not bring this information to the court's attention at this time. (Tr. 152-153.)

{¶25} After the case ended, many of the jurors went out for beer and pizza. During this meal, another juror, a younger white blonde female, told T.M. that Appellant had been

in prison for another rape, and she said "we were dying to tell you." When asked at the hearing who she was referring to when she said "we," T.M. said she was "clearly referring to the jury foreman." T.M. said the foreman was sitting nearby and heard their conversation in the restaurant. T.M. said the foreman then "quieted her down" because "I think he realized that she was treading on dangerous territory." "That's speculation on my part." T.M. then explained he believed "they [the foreman and blonde juror] knew [about the prior conviction] and that if I had known, my decision in the penalty phase would have been a lot easier had I known that." (Tr. 131-134.)

{¶26} T.M. recalled being angry that the other jurors had not followed the rules or abided by their oath. T.M. then identified the affidavit he had previously signed, Defendant's Exhibit 11. (Tr. 135-137.)

{¶27} T.M. also testified that it bothered him that a few jurors, who parked near one another, seemed to be too talkative with one another almost every night when the jurors were released. He said "these people didn't know each other before the trial, so what else are they talking about." T.M. also said it bothered him how quickly others were able to reach a verdict. (Tr. 141-142.)

{¶28} On cross-examination, T.M. denied the prosecutor spoke to the jury. T.M. acknowledged, however, he was a smoker at the time of trial. T.M. agreed it was possible he was outside smoking when the conversation occurred. (Tr. 149-151.)

{¶29} In his May 5, 2012 affidavit, T.M. stated that during the sentencing phase of Appellant's trial, "some jurors were eager to give Bennie Adams the death penalty." After much deliberation, however, T.M. ultimately agreed with them and voted in favor of death. After they reached their decision, but before it was announced, T.M. stated the jury had one last lunch in the courtroom. During this lunch, fellow juror D.G. told him, "if it made me feel better, Bennie Adams was in prison for rape for 17 years." (Defendant's Ex. 11.)

{¶30} T.M. also stated in his affidavit that after the verdicts were announced, a different juror told him at a restaurant that "they wanted to tell me, had been dying to tell me, that Bennie Adams had been in prison for rape for years. The jury foreman, who was sitting next to her, then quieted her." T.M. further described himself as struggling with the death sentence, along with a few other jurors, but said he finally "caved" and once he caved, "two female jurors did as well. I don't think they were strong enough to last without

me as an ally." T.M. said it was "puzzling" to him why others were so quick to vote for death. He also stated, "I was not convinced that the rape charge was proven. The evidence was weak. I believe it was easier for the jurors who knew of Bennie Adams' prior rape conviction to get past the lack of proof of the rape in this case." (Defendant's Ex. 11.)

{¶31} M.M. testified he was an alternate juror for Appellant's trial. M.M. learned Appellant had a prior rape conviction after the trial was over when the jurors were being dismissed. M.M. stated the lady in charge of the jury process asked if any of them had questions. A fellow juror asked this woman about Appellant's prior conviction, which was referenced during the penalty phase. She informed those present that Appellant had a prior rape conviction. Before this time, M.M. had not heard jurors talking about Appellant's prior conviction. (Tr. 165-167.) M.M. learned this information after the death penalty decision was announced and the case had concluded. Some of the jurors had already left. (Tr. 173-174.)

{¶32} Juror D.W. testified at the hearing. D.W. has since learned that Appellant had a prior rape conviction at the time of trial. However, D.W. did not know about it at the time of trial. D.W. learned about this fact when a family friend told him about it after the trial concluded, after the guilty verdict and sentence were announced. (Tr. 181-184, 190.)

{¶33} D.G. confirmed she was one of the jurors for Appellant's trial. She was upset that she was called about this case after so long and that someone had claimed she was involved with impropriety. D.G. met with prosecutors and was shown a photograph of juror T.M. She did not remember him. D.G. did not know about Appellant's prior rape conviction during his trial or sentencing phase. However, D.G. remembered someone from the prison testified on Appellant's behalf during the penalty phase. D.G. eventually learned about Appellant's prior rape conviction from the prosecutor after the trial was over and the verdicts were announced. The prosecutor spoke with the jurors to see if they had any questions. D.G. denies going to get pizza and beer with other jurors after the case concluded. D.G. also denies telling juror T.M. about Appellant's prior rape conviction at any time, including before the case was over. (Tr. 192-212.)

{¶34} Juror J.P. testified. She was asked whether before the trial began if she had been exposed to anything in the media or told anything about Appellant's

background. She answered no. J.P. also denied learning about Appellant's background during her jury service. About a month before the *Remmer* hearing, she was contacted by someone who was asking similar questions about her time as a juror. She said during the trial, the jurors knew he was in prison, but they did not know why he was incarcerated. J.P. said she did not go out to eat with other jurors. (Tr. 218-227.)

**{¶35}** Two juror deposition transcripts were filed in lieu of live testimony due to unavailability of the past jurors.

**{¶36}** Juror D.S. testified via deposition. She was asked to review her juror questionnaire and asked which newspapers she read at the time of Appellant's trial. D.S. denied learning anything about Appellant's past criminal conduct before she was sworn in as a juror. She recalls eating at a restaurant with other jurors after the case was concluded. She said it was noisy. She does not remember any of the other jurors discussing the fact that Appellant had a prior rape conviction. (D.S. Deposition Tr.)

**{¶37}** Juror D.C. II also testified via deposition. She was asked about what she and other jurors had heard about Appellant's prior conviction. D.C. II replied that "we never heard anything about his * * * prior conviction, that I can recall." She testified that she learned about the prior conviction when the case had concluded. Certain detectives spoke to some of the jurors when the jurors were heading to the parking lot. It was after the case was over. D.C. II recalls going to eat with the other jurors. She remembered the restaurant, but said they met about a month after the trial had concluded. D.C. II does not remember any of her fellow jurors discussing Appellant's prior rape conviction during the trial or during a lunch they ate in the courtroom. (D.C. II Deposition Tr.)

**{¶38}** The trial court's decision provides a summary of the evidence it deemed relevant and concluded it would not consider Dr. Edelman's testimony. The court explained that because the hearing showed the jurors did not know about Appellant's prior conviction at the time of his trial, the expert's testimony as to how this knowledge would have impacted them was not relevant. (July 6, 2023 Judgment.)

**{¶39}** The trial court emphasized that all of the jurors who knew about Appellant's prior rape conviction agreed they learned this information after their verdict was rendered and after the penalty phase of the case concluded. The only witness who disagrees with this consensus was T.M., yet he testified about how other jurors allegedly knew this

information. T.M. did not testify that he was aware of it before voting. Moreover, the jurors who T.M. claimed were aware of the prior rape conviction denied knowing this information before the verdicts were reached.

**{¶40}** The court found T.M.'s testimony was contrary to the rest and found he was suspicious of the other jurors. The trial court also found juror D.G.'s testimony was more credible than T.M.'s. The court concluded the evidence presented did not show that Appellant's prior conviction was known or considered during jury deliberations, and as such, it found the juror bias allegation was unsubstantiated. (July 6, 2023 Judgment.)

**{¶41}** Appellant timely appealed the trial court's decision and raises three assigned errors.

First Assignment of Error: Evidentiary Rulings

**{¶42}** Appellant's first assignment of error contends:

"The trial court abused its discretion when it improperly limited what evidence Adams could present in violation of his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution. [Judgment Entry, June 8, 2023; Hrg. Tr. 6-64, 79-80.]"

**{¶43}** This assignment consists of three arguments. Appellant first contends res judicata does not preclude the introduction of evidence or questioning about pretrial publicity. Appellant next argues the trial court abused its discretion by precluding expert testimony on juror psychology, memory, and media exposure.

**{¶44}** Appellant's third argument under this assignment challenges the trial court's decision to limit his questioning of the jurors about their exposure to pretrial publicity and news. Appellant claims these limitations were an abuse of discretion and denial of the right to due process, and as such, we should reverse and order a new hearing.

**{¶45}** Neither side directs us to cases dealing with similar expert testimony or jury questioning in a *Remmer* hearing.

**{¶46}** The United States District Court for the Northern District of Ohio held that Appellant established a "colorable claim of extraneous influence," and thus, he was entitled to a hearing to prove actual bias. The court found Appellant could apply for release from custody unless the state held a *Remmer* hearing to interview jurors within 150 days. *Adams v. Eppinger*, N.D.Ohio No. 4:21-CV-00158, 2023 WL 1969740, *12.

Case No. 23 MA 0086

**{¶47}** It concluded that Appellant offered "sworn affidavit evidence that deliberating jurors somehow knew about Adams's conviction of a separate rape, kidnapping and robbery. * * * Adams had the right to have this issue examined." *Id.* at *8. It found the state had skipped the constitutional step of holding a hearing to investigate "when the jurors learned about his prior rape conviction and * * * what, if any, impact any prior conviction knowledge may have had [on the jury's decision.]" *Id.* (applying *Cunningham v. Shoop*, 23 F.4th 636 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 37 (2022). "The question is whether, given the indications of jury bias, the * * * inquiry was adequate * * *." *United States v. Lanier*, 988 F.3d 284, 296 (6th Cir. 2021).

**{¶48}** A *Remmer* hearing must provide a meaningful opportunity for the defendant to explore actual bias and prejudice during an evidentiary hearing. *Shoop, supra,* at 662. "[T]he party alleging misconduct bears the burden of demonstrating that the contact was prejudicial." *Smith v. Phillips*, 455 U.S. 209, 215-217, 102 S.Ct. 940 (1982).

**{¶49}** The trial court had to conduct the hearing within 150 days to examine two issues. First, it was to determine when the jurors learned about Appellant's prior rape conviction. Thus, inquiry should have been made about the timing of when jurors learned extrajudicial information; the nature of the information learned by the jurors; and the content of information. *Adams v. Eppinger*, *supra*, quoting *Shoop* at 651-652.

**{¶50}** Second, the trial court was to assess the prejudicial effect of the information by ascertaining what impact this knowledge may have had on the juror's decisions. As the trial court concluded, a finding that none of the jurors knew about Appellant's prior conviction during his trial made an investigation into the impact this information may have had on their deliberations and verdicts unnecessary.

### Expert Testimony

**{¶51}** Appellant proffered the testimony of his expert, Dr. Bryan Edelman, who has a master's degree in psychology in the legal environment. He was retained by the Ohio Public Defender's Office to assist with Appellant's case. Edelman wrote a report on Appellant's case, which was offered as an exhibit during his proffered testimony. Edelman recalled there were 12 to 14 reports in the local newspaper before Appellant's trial that mentioned he had a prior rape and robbery conviction. He generally testified that the voir dire for Appellant's trial was inadequate. He also stated he believes the jurors

were exposed to the fact that Appellant had a prior rape conviction before trial commenced based on the significant media coverage. He also opined that most jurors who were contacted fifteen years after serving on a criminal case would likely be biased and prone to protect the verdict. (Proffer of Bryan Edelman, PH.D.)

**{¶52}** Edelman's report was proffered as an exhibit. It states, in part, that the jury pool was exposed to prejudicial media coverage about the facts of this offense as well as Appellant's prior conviction. He also explained in his opinion that the voir dire and juror questionnaire in Appellant's case were inadequate. Edelman stated it was his opinion that the fairness of the trial was undermined. He concluded, based on social science literature and T.M.'s affidavit, that inadmissible pretrial publicity adversely affected the jury and verdict. (Edelman report, Defendant's Exhibit 17.)

**{¶53}** Appellant claims there was circumstantial evidence showing the jurors were exposed to prejudicial information. Edelman's report was proffered and marked as Defendant's exhibit 17. A 142-page compilation of local news coverage of Appellant's case, Defendant's exhibit 18, was also proffered.

**{¶54}** As for Appellant's res judicata argument, the court did not issue a blanket order precluding Edelman's testimony based on res judicata. Instead, the court precluded this testimony based on res judicata only to the extent the expert was going to testify about the "general effect of pretrial publicity on the venire * * *." The trial court advised it would allow Edelman's "testimony regarding the psychology about how knowing details of Adams' prior convictions affected jury deliberations" if it was revealed during the hearing that the jurors were aware of Appellant's prior conviction before rendering its verdict. (June 8, 2023 Judgment.)

**{¶55}** Res judicata bars any claim that was or could have been raised at the time of trial or on direct appeal. *State v. Steffen,* 70 Ohio St.3d 399, 410, 639 N.E.2d 67 (1994). No one disputes that the issue of pretrial publicity was addressed in Appellant's direct appeal. *State v. Adams*, 7th Dist. Mahoning No. 08 MA 246, 2011-Ohio-5361, ¶ 159, ¶ 174, *aff'd in part, vacated in part,* 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127. Appellant's first assigned error on appeal challenged the time limit placed on voir dire. He alleged it denied him due process by curtailing his inquiry into pretrial publicity. This court disagreed. *Id.*

Case No. 23 MA 0086

**{¶56}** Thus, to the extent Appellant sought to introduce Edelman's testimony and an exhibit detailing the extent of local media coverage of the case to show the venire was generally exposed, we agree this issue was barred by res judicata.

**{¶57}** However, Appellant argues he was *not* seeking to introduce this evidence to show the entire jury pool was tainted. Instead, he wanted to use Edelman's testimony about the extent of the pretrial media coverage to demonstrate the selected jurors knew about Appellant's prior conviction. Appellant contends there was circumstantial evidence, i.e., Edelman's testimony and exhibit 18 containing news articles, that the jurors were exposed to information about his prior conviction before or during trial.

**{¶58}** The state counters the court was within its discretion when it excluded this evidence about pretrial publicity and news exposure. The state contends the expert's testimony intruded on the role of the trier of fact and was not relevant. *See State v. Fowler*, 7th Dist. Columbiana No. 20 CO 0002, 2021-Ohio-2854, 2021, ¶ 23, analyzing *State v. Boston,* 46 Ohio St.3d 108, 129, 545 N.E.2d 1220 (1989), ("where the expert's testimony usurps the role of the jury and directly expresses an opinion about the child victim's truthfulness, it must be excluded. *Id.,* at syllabus.")

**{¶59}** Trial courts have broad discretion in admitting or excluding expert testimony. *Green Maple Enterprises, LLC v. Forrester*, 2021-Ohio-4640, 182 N.E.3d 1265, ¶ 63. (7th Dist.)

> The trial judge is in a significantly better position to analyze whether testimony or evidence is relevant or irrelevant and the impact of the evidence on the [fact finder]; thus the court's decision will be reversed only upon a showing of an abuse of discretion. * * * The abuse of discretion must materially prejudice a party in order for the trial court's decision to be reversed. * * *.

*Banford v. Aldrich Chem. Co. Inc.,* 126 Ohio St.3d 210, 2010-Ohio-2470, 932 N.E.2d 313, ¶ 38. An abuse of discretion implies the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶60}** "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence." Evid.R. 401. "Evidence which is not relevant is not admissible." Evid.R. 402.

{¶61} Evid.R. 702 governs expert testimony and states in part:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

{¶62} To the extent Appellant sought to have his expert give his opinion that the jurors were exposed to prejudicial information about the case that ran contrary to their individual memories and testimony, we find no error. The jurors were thoroughly questioned about what they knew and when they learned certain information. Edelman's testimony essentially commented on the juror's ability to remember and veracity.

{¶63} As the state contends, this testimony tends to invade the province of the trier of fact. The lead Ohio Supreme Court case on improper vouching, *State v. Boston*, 46 Ohio St.3d 108, 129, 545 N.E.2d 1220 (1989), generally held a witness may not testify as to their opinion of the veracity of the statements of a victim "because it is the fact-finder who bears the burden of assessing the credibility and veracity of witnesses." *Id.*

{¶64} Here, Edelman's testimony generally challenges the juror's credibility and individual memories. Edelman testified that he believes the jurors were exposed to the fact that Appellant had a prior rape conviction before trial commenced based on the significant media coverage. This directly conflicts with the testimony of each juror. If permitted, Edelman would have essentially testified that these jurors were unable to remember critical issues and their testimony should not be believed due to the passage of time, among other things. "In our system of justice[,] it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and

Case No. 23 MA 0086

veracity of witnesses." *Id.* at 128-129, 545 N.E.2d 1220, quoting *State v. Eastham*, 39 Ohio St.3d 307, 312, 530 N.E.2d 409 (1988), Justice Brown, concurring.

**{¶65}** Because the jurors were before the court and subject to examination by defense counsel and the prosecution, we find no abuse of discretion.

**{¶66}** Appellant also claims the trial court erred by excluding his expert's testimony summarizing relevant research, including how memory recall works, which would have given reasons and context to the jurors' testimony. Appellant also claims the court erred by excluding his expert's testimony about his investigation relative to the impact of the news and "common pitfalls" of jury decision-making.

**{¶67}** As previously detailed, none of the jurors testified that they knew about Appellant's rape conviction before reaching their verdicts, except T.M. And T.M. testified that this information did not impact his decision because he had already voted to convict and in favor of death before he heard about the prior rape offense. Thus, consistent with the trial court's decision, this aspect of Edelman's testimony was not relevant.

**{¶68}** Thus, Appellant's first and second arguments under this assigned error lack merit.

## Juror Questioning

**{¶69}** Appellant's third sub-argument asserts the trial court erred by limiting the scope of what questions he could ask the jurors. Appellant claims he intended to ask the jurors about potential ways by which they could have learned about his prior imprisonment for rape. Appellant states the exclusion of this type of questioning prohibited him from a full and fair hearing, contrary to the directive of the conditional writ.

**{¶70}** As stated, the trial court's preliminary ruling on this issue prohibited questioning and testimony "as to the *general* effect of pre-trial publicity on the venire * * *." The court did not prohibit questions about information provided on their juror questionnaires. It did not generally limit questioning about what they learned before or during trial.

**{¶71}** To the extent Appellant sought to ask the jurors questions about their individual or personal exposure to pretrial publicity to elicit if, how, or when each juror learned about Appellant's prior rape conviction or prison term, these questions were relevant and admissible.

{¶72} Jurors D.C. and E.T. were asked about what news sources they followed at the time of trial. Juror D.F. was not asked this question but was asked if there were any "other sources" from which she learned Appellant had a prior rape conviction. (Trial Tr. 22.) Juror R.C. was not asked about pretrial publicity or exposure. (Tr. 42-50.)

{¶73} During the testimony of Juror R.C. II, however, the trial court sustained the state's objection and stated "with regard to pretrial publicity, I don't want any testimony with regard to that. That's prohibited." The defense then asked "Would it be relevant to the extent it could have been a source of coming across the information?" The court indicated: "It depends on the timing as well." The discussion then continued off the record. Thereafter, the defense was permitted to ask: "Before you served as a juror, do you remember seeing, reading or hearing anything about this case?" (Tr. 63-64.)

{¶74} Juror P.B. was asked by the defense: "Before showing up to jury duty had you heard about the case at all?" She answered no. (Tr. 79.)

{¶75} Jurors M.C., J.J., T.M., M.M., D.W., D.G., and D.C. II were not asked questions in this regard.

{¶76} Juror J.P. was asked what media she was exposed to before trial. She denied learning about Appellant or his background before his trial. (Tr. 218-227.) One of the jurors who testified via deposition, D.S. was also asked questions about her media exposure before trial.

{¶77} Contrary to Appellant's argument, we disagree that he was generally prohibited from asking questions about pretrial media exposure. Instead, at least four jurors were asked directly about their media exposure. Further, several other jurors were indirectly asked about their media exposure when asked about what they heard or learned about the case before or during the case.

{¶78} Additionally, the juror's questionnaires were admitted as exhibits. Each juror answered the questions about what newspapers they read and what radio and television shows they watched at the time. The questionnaires also asked what sections of the newspapers they read. These questions were answered at the time of trial in September of 2008 and were before the court for its consideration.

{¶79} We agree that specific questions about what news sources viewed before and at the time of trial were relevant to ascertaining how each juror learned about

Case No. 23 MA 0086

Appellant's prior conviction or sentence. Notwithstanding, it seems the trial court limited the scope of questioning in this regard to streamline the hearing.

**{¶80}** Defense counsel questioned each juror on the critical issues before it, i.e., whether the juror knew about Appellant's rape conviction or prison term at the time of trial. None of the jurors testified they were aware of the prejudicial information before deliberating or recommending Appellant's sentence.

**{¶81}** Thus, to the extent the trial court limited questioning about specific media exposure, we find no abuse of discretion. There is nothing indicating the trial court's decision is unreasonable, arbitrary, or unconscionable.

**{¶82}** Based on the foregoing, Appellant's first assigned error lacks merit and is overruled.

<u>Second Assignment of Error: Credibility Determinations</u>

**{¶83}** Appellant's second assignment of error asserts:

"The trial court abused its discretion in making erroneous and unsupported credibility determinations in violation of Adams' right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution. [Judgment Entry, July 5, 2023.]"

**{¶84}** Here, Appellant claims the trial court's credibility determinations are unsupported by the record. He challenges the court's decision in part because the court stated that except for Juror T.M.'s testimony, all the other testimony was consistent. For the following reasons, this assignment lacks merit.

**{¶85}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Credibility of witnesses is primarily for the finder of fact because the jury or factfinder is best able to view the witnesses and observe their demeanor, including voice inflections and body language. *Matter of Estate of McDaniel*, 2023-Ohio-1065, 212 N.E.3d 351, ¶ 41-42 (7th Dist.), citing *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 81, 461 N.E.2d 1273 (1984).

**{¶86}** Here, the trial court detailed its findings and gave reasons supporting its decision in its 11-page decision, stating in part:

<u>Case No. 23 MA 0086</u>

Based upon the evidence presented, the Court finds all of the testimony consistent, except for that of Juror [T.M.]. According to [T.M.], at least three jurors knew of Adams' prior conviction during the trial. He surmised this because a blonde juror told him "we were dying to tell you" [about the prior conviction] at [the restaurant], after the trial was concluded. [Juror T.M.] assumed "we" meant she and the foreman, as [the foreman] was a part of the conversation. * * * However, as [Juror T.M.] acknowledged, this is mere speculation. Many of the jurors reported learning of this information after the trial was concluded. * * *

While recollections varied as to whom delivered the information, all of the jurors who heard about Adams' prior conviction agreed it occurred after they were dismissed. * * * This was consistent with the testimony that some of the jurors had already gathered their belongings and left, as their official duties had concluded.

(July 5, 2023, Judgment.)

{¶87} Moreover, the court also noted that Juror T.M. acknowledged he was a smoker at the time, and he may have taken a smoke break. The court felt Juror T.M. was generally suspicious of his fellow jurors based on his testimony. Notwithstanding his suspicions and complaints about the other jurors making a quick decision and socializing on the way to the parking lot, Juror T.M. reached the same verdict of guilt and also voted in favor of the death penalty. (July 5, 2023, Judgment.)

{¶88} The court also explained how the statement we were "dying to tell you" does not necessarily indicate that the blonde juror knew this information she was "dying" to share for an extended duration. Further, it stated it believed Juror D.G.'s description of herself as not social. This detail lent credibility to her testimony that she did not socialize with the other jurors, who were older. Importantly, each juror, except Juror T.M., agreed they did not know about Appellant's prior conviction during the trial or penalty phase. (July 5, 2023, Judgment.)

{¶89} We acknowledge the jurors' individual testimony was not largely consistent regarding their individual memories about the trial, who they spoke with, and where and when they ate. The discrepancies, no doubt, are due to the passage of time. They likely

misremembered details since the trial occurred in October of 2008, and the hearing was more than 14 years later. Discrepancies likely also flowed from the fact that certain jurors learned the information differently, and it is common knowledge that individuals recall things differently.

**{¶90}** Notwithstanding, the juror's individual testimony was consistent on the chief issue—none knew about Appellant's prior rape conviction and sentence until after the jury deliberations had ended, they reached a verdict, and the death sentence was recommended. This fact was critical, and none of the jurors waivered on this detail. None, except for T.M., whose testimony was before the court for it to consider. The trial court evidently did not believe his testimony or sequence of events.

**{¶91}** The trial court judge, as the trier of fact, was in the best position to view the witnesses' behavior, voice inflections, facial expressions, and assess their credibility. *McGail v. Warden N. Cent. Correctional Institution*, S.D.Ohio No. 3:22-CV-119, 2023 WL 6319357, *4 (Credibility determinations by the trial court judge in a *Remmer* hearing are entitled to deference.) Accordingly, we decline to find error.

**{¶92}** This assignment of error lacks merit and is overruled.

<u>Third Assignment of Error: Burden of Proof</u>

**{¶93}** Appellant's third assignment of error states:

"The trial court abused its discretion when it failed to grant Adams a new trial in violation of his constitutional rights to due process and a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution. [Judgment Entry, July 5, 2023.]"

**{¶94}** As stated, the *Remmer* hearing was ordered to afford Appellant the opportunity to establish whether the jurors knew about his prior rape conviction before rendering their verdicts, and if so, whether the jury's decisions were prejudiced as a result.

**{¶95}** Appellant contends he met his burden of proof and showed certain jurors knew about his prior rape conviction and this information biased the outcome of his trial. Appellant claims juror T.M.'s testimony, coupled with alternate juror M.M.'s testimony, show the jury had this information. Appellant claims M.M.'s testimony about when he learned about Appellant's prior conviction must be wrong because it is not supported by the record. For the following reasons, we disagree.

<u>Case No. 23 MA 0086</u>

{¶96} First, Appellant points to the testimony of Juror T.M. as showing the jury was aware of the prejudicial information about his prior rape conviction. As stated, however, we agree with the trial court and find T.M.'s testimony did not establish any jurors knew this information since the trial court found his testimony less credible than D.G.'s. The trial court found T.M. was suspicious and distrustful of his fellow jurors. Although not stated by the trial court, the behaviors T.M. described as suspect are objectively benign. Because credibility determinations are for the trier of fact, we do not second-guess the trial court's decision.

{¶97} Second, Appellant alleges alternate juror M.M.'s testimony confirms that all of the jurors knew about Appellant's prior rape conviction before the sentencing phase. We disagree.

{¶98} M.M. testified at the hearing that the other jurors were nearby when he learned about Appellant's prior conviction. M.M. also recalled he learned this information after the alternates were privately asked in the judge's chambers whether they agreed with the guilty verdict.

{¶99} However, Appellant claims the official trial transcript shows M.M. was relieved of his alternate jury service after the trial phase and before the penalty phase. Thus, he claims this necessarily establishes that all the jurors learned about Appellant's prior conviction before the penalty phase. This argument was raised during M.M.'s testimony at the hearing.

{¶100} As stated, M.M. testified he learned Appellant had a prior rape conviction after the trial was over when the jurors were being dismissed. M.M. testified that the woman in charge of the jury process asked if any of them had questions. A fellow juror asked this woman about Appellant's prior conviction, which was referenced during the penalty phase. She informed the individuals present that Appellant had a prior rape conviction. Before this time, M.M. had not heard jurors talking about Appellant's prior conviction. (Tr. 165-167.) M.M. learned this information after the death penalty decision was announced and the case had concluded. Some of the jurors had already left. He thinks all of the alternates were present at this time. (Tr. 173-174.)

{¶101} M.M. confirmed he was juror number 157. M.M. said he was present when the death penalty was announced. He also confirmed that before that moment, he had not heard about Appellant's prior conviction. (Tr. 170-173.)

{¶102} Contrary to Appellant's claim, M.M. denied remembering the judge dismissed him as an alternate before the sentencing phase deliberations. He said "I don't remember that, so the answer is no, I don't remember being dismissed early [before the other jurors.]" M.M. also denied remembering the trial court judge telling the alternates that he does not "need them to stick around for the sentencing phase deliberations." (Tr. 171-172.)

{¶103} This issue was addressed during the hearing, and M.M. said he was positive he learned this information after the main jury was released and relieved of its duties, not before. (Tr. 177-178.)

{¶104} Appellant now claims the trial transcript conflicts with M.M.'s testimony. The trial court did not allow defense counsel to recite the transcript during the hearing. Appellant contends the transcript is inconsistent with M.M.'s testimony, stating "according to the transcripts, the alternates were only interviewed in the judge's chambers once— directly after the trial phase." This transcript was referenced at the hearing, and the issue was fully vetted during M.M.'s testimony.

{¶105} Moreover, M.M.'s testimony about how he learned of Appellant's prior conviction is consistent with the memories of other jurors, who recalled learning about the prior conviction from court personnel after their service ended. This consistency lends credibility. Although details in the juror's testimony are inconsistent, what was not inconsistent was that none of the jurors knew this critical fact before rendering a verdict.

{¶106} Given the indications of jury bias in this record, we find the inquiry at the hearing was adequate. *United States v. Lanier*, 988 F.3d 284, 296 (6th Cir. 2021). Each living juror and alternate was subject to cross-examination, and the circumstances surrounding T.M.'s memory and suspicions of the other jurors were fully examined. The court found the claims of juror bias unsubstantiated because it believed the testimony of the jurors, except T.M. It found none of the jurors knew about Appellant's prior conviction when it could have impacted their verdicts.

{¶107} Because issues concerning the weight given to evidence and the credibility of the witnesses are primarily for the trier of fact, *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus, this assigned error lacks merit.

Conclusion

{¶108} For the foregoing reasons, Appellant's assignments of error lack merit. The trial court's decision is affirmed.

Hanni, J., concurs.

Dickey, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**