[Cite as *State v. Parks*, 2024-Ohio-5026.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 30049 |
| | : | |
| v. | : | Trial Court Case No. 2021 CR 03098/1 |
| | : | |
| DANA PARKS | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on October 18, 2024

. . . . . . . . . . .

CHRISTOPHER BAZELEY, Attorney for Appellant

MATHIAS H. HECK, JR., by NATHAN B. VANDERHORST, Attorney for Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Dana Parks, appeals from his convictions and sentences related to the July 2021 murder of K.H.   In support of his appeal, Parks raises

the following alleged errors: (1) his conviction for attempted arson was unsupported by legally sufficient evidence; (2) the trial court plainly erred in letting the jury see various gruesome and duplicative photographs from the autopsy and crime scene; (3) his defense was prejudiced by trial counsel's ineffective assistance in failing to move for a mistrial; (4) the order requiring Parks to pay restitution was contrary to law; (5) imposing sentence pursuant to R.C. 2929.14(B)(1)(g) on a firearm specification that was part of a merged conviction violated double jeopardy protections provided by the Ohio and United States Constitutions; and (6) the trial court erred in admitting evidence pertaining to a bullet casing and a box of bullets.

{¶ 2} After reviewing the record, we conclude that the conviction for attempted arson was supported by sufficient evidence, as Parks was not present as an innocent bystander when the murder victim's car was burned. In addition, the trial court did not commit plain error in admitting alleged gruesome photos because the photos aided in proving the charges. The evidence against Parks was also overwhelming, and this case does not present exceptional circumstances warranting reversal to prevent a manifest miscarriage of justice.

{¶ 3} Further, Parks's trial counsel did not commit ineffective assistance in failing to ask for a mistrial based on an outside party's communication with a juror. The trial court properly held a hearing and found no reason that the juror could not be impartial. Given this fact, there was no reason to move for a mistrial. The trial court did not err in ordering a minimal amount of restitution. The court did not have to expressly state that it considered Parks's ability to pay; consideration can be inferred from the circumstances

here.

{¶ 4} Additionally, Parks incorrectly claims that R.C. 2929.14(B)(1)(g) violates double jeopardy protections by allowing sentence to be imposed on a firearm specification that is part of a merged conviction. The Supreme Court of Ohio found this sanction permissible in *State v. Bollar*, 2022-Ohio-4370, and lower courts are bound by that holding. Finally, the trial court did not err in admitting evidence pertaining to a bullet casing found at Parks's home and a box of bullets found on a neighbor's roof. These items were consistent with the bullet found in the victim's body and were also relevant to the charge of tampering with evidence. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 5} On December 9, 2021, an indictment was filed charging Parks with 11 crimes related to K.H.'s murder, which occurred on July 4, 2021. The charges included: two counts of murder (Counts One and Three); two counts of felonious assault (deadly weapon and serious harm) (Counts Two and Four); three counts of tampering with evidence (alter/destroy) (Counts Five, Six, and Seven); gross abuse of a corpse (Count Eight); attempt to commit arson (Count Nine); arson (Count Ten); and having weapons under disability (prior offense of violence) (Count Eleven). Five counts included a three-year firearm specification. Following the indictment, Parks pled not guilty, counsel was appointed, and bond was set at $1,000,000 (surety bond). In February 2022, Parks filed a waiver of speedy trial requirements, and in April 2022, the court reduced the bond to an

$850,000 surety bond.   After new counsel was appointed, Parks filed a motion to suppress identification evidence in July 2022, which the court overruled in December 2022 after holding a hearing.

{¶ 6} Prior to trial (which ultimately began on November 13, 2023), Parks filed a motion in limine asking the court to exclude evidence, including a bullet casing found on the rear porch of his residence.   The court overruled the motion at trial.   *See* Transcript of Proceedings (Jury Trial and Sentencing Hearing) ("Tr."), 503.   During trial, the court granted Parks's Crim.R. 29 motion for acquittal on Counts Eight and Ten (gross abuse of a corpse and arson) and renumbered the counts.   *Id.* at 876 and 885.   The jury then found Parks guilty on the remaining charges.   The court also found Parks guilty of having a weapon under disability and the firearm specification attached to that charge.   *Id.* at 974.

{¶ 7} At sentencing, the court merged Counts One through Four (the murders and felonious assaults), and the State elected to have the court sentence Parks on Count One (murder).   During the hearing, the court imposed the following sentences: 15 years to life in prison on Count One, with the three-year gun specification imposed prior to and consecutive to that term; three years in prison on the firearm specification for Count Two, imposed prior to and consecutive to the term for Count One; concurrent sentences for the firearm specifications for Counts Three and Four; 36 months each on Counts Five and Six, concurrent to Count One; 24 months on Count Seven, consecutive to Count One; 12 months on Count Eight, concurrent to Count One; 24 months on Count Eleven, concurrent to Count One, and an additional three years in prison on the firearm specification for

Count Eleven, to be served concurrently. The total prison sentence was 23 years to life.

{¶ 8} On January 5, 2024, the trial court filed its judgment entry, and Parks timely appealed. However, we dismissed the appeal for lack of a final appealable order because the judgment entry failed to reflect that the trial court had resolved all the pending charges against Parks. *State v. Parks*, 2d Dist. No. 30020 (Decision & Final Judgment Entry, Feb. 15, 2024), p. 2-3. After the court filed an amended judgment entry on February 16, 2024, Parks again timely appealed, and we designated this appeal as 2d Dist. Montgomery C.A. No. 30049. We appointed appellate counsel for Parks on February 21, 2024, but for some reason, Parks filed a pro se notice of appeal on April 5, 2024. We dismissed that appeal as duplicative. *See State v. Parks*, 2d Dist. No. 30097 (Decision & Final Judgment Entry, Apr. 9, 2024).

## II. Sufficiency of the Evidence on Attempted Arson

{¶ 9} Parks's first assignment of error states that:

Parks' Conviction for Attempted Arson as a Felony of the Fifth Degree Is Not Supported by Legally Sufficient Evidence.

{¶ 10} Parks contends that his attempted arson conviction, which involved burning the victim's automobile, was not supported by sufficient evidence. According to Parks, he lacked prior knowledge that his brother, Ernest, was going to set fire to the car, and he (Parks) was merely present at the scene. Parks further contends that the State failed to present sufficient evidence that the value of the automobile was more than $1,000.

{¶ 11} " 'Whether the evidence is legally sufficient to sustain a verdict is a question

of law.' " *State v. Groce*, 2020-Ohio-6671, ¶ 7, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Id.*, citing *State v. Jenks*, 61 Ohio St. 3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, fn. 4 (1997).

{¶ 12} In addition to being charged with murder and felonious assault, Parks was charged with three counts of tampering with evidence relating to: the Valencia shooting scene (Count Five); personal items and the body of K.H. "in the wooded area of West Riverview and Linnbrook Drive" (Count Six); and a Buick motor vehicle associated with victim, K.H. (Count Seven). These were all third-degree felonies.

{¶ 13} Parks was also charged with abuse of a corpse (Count Eight, a fifth-degree felony); attempt to commit arson (Count Nine, a fourth-degree felony), and arson (Count Ten, a first-degree misdemeanor). At trial, the court overruled Parks's Crim.R. 29 motion for acquittal on all these counts except for the abuse of a corpse charge and the related arson charge (Counts Eight and Ten), which the court found unsupported by sufficient evidence. Tr. at 876-879 and 885. The charge in question here is the original Count Nine, and we will refer to it as such, although it was relabeled as Count Eight after another count was dismissed.

{¶ 14} The crime alleged in Count Nine was a violation of R.C. 2909.03(A)(1), which provides that: "(A) No person, by means of fire or explosion, shall knowingly do any

of the following: (1) Cause, or create a substantial risk of, physical harm to any property of another without the other person's consent." Under this statute, the crime was a first-degree misdemeanor unless the property's value was $1,000 or more. In that case, the crime was elevated to a fourth-degree felony. R.C. 2909.03(D)(2)(a) and (b).

{¶ 15} However, since only an attempt was alleged, the conviction would be a fifth-degree felony. *See* R.C. 2923.02(A) and (E)(1). Under this statute, "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A). The trial court's jury instructions for Count Nine specified that the attempted arson involved a Buick motor vehicle. Tr. at 955.

{¶ 16} To place the attempted arson charge in context, we note the following background (construing the evidence in the State's favor). The victim, K.H., was Parks's best friend and had been the best man at Parks's wedding a few months before the murder. Tr. at 243, 306, 308, and 317. On the evening of July 3, 2021, K.H. attended a family get-together held at the home of a longtime friend, J.H., and left her house around 12:38 a.m., i.e., in the early morning of July 4. J.H. expected to hear from K.H. later that night, but he did not call, which was unusual. *Id.* at 303, 308, and 310-311.[1]

{¶ 17} On the evening of July 3, Parks and several others attended a comedy show in Dayton, Ohio. The people who attended were: Parks and his wife, Heidi; Parks's brother, Ernest, and Ernest's girlfriend, Crystal; Heidi's friend, Reggie; and S.L., who had been dating K.H. for about a year. *Id.* at 326-327 and 597-598. S.L. arrived at the club

---

[1] Initials will be substituted for the names of the victim and the witnesses who testified at trial, in order to protect their privacy.

in an Uber. *Id.* at 599. The group stayed at the club for about two hours and left at 11:00 p.m. or 12:00 a.m. People were consuming alcohol. *Id.* at 327, 599, and 601. Ernest had driven separately and, on leaving, he and Crystal returned to their home on Military Boulevard, on the west side of Dayton. *Id.* at 599-699 and 802.

{¶ 18} Parks and the rest of the group returned to Parks's house on Valencia Street in Riverside on the east side of Dayton, which was around 18 to 20 minutes away from Ernest's home. They decided to go out again, so Ernest drove to Parks's house. Crystal did not want to go, so she stayed at home. *Id.* at 327, 328, 599, 600, and 792. All five members of the remaining group intended to go out, but Heidi and Parks had some sort of dispute, so he stayed home. According to Ernest, Parks had been drinking and was a bit more agitated and aggressive than normal. *Id.* at 328, 602-603, and 605. Ernest, Heidi, S.L., and Reggie left in Ernest's Black Tahoe and went to Deja Brew, which was about a half-mile away. They did not stay long and then went to a place called Jay and Jean's in Huber Heights, which was about 20 minutes away. They stayed there until closing, which was around 2:00 to 2:30 a.m. *Id.* at 606 and 607-608.

{¶ 19} Before they left the bar, S.L. was receiving communications from K.H., and her mood changed. She wanted to leave, so they left. The bar was closing anyway. Tr. at 608-609. On the way home, Ernest was driving, and S.L. was sitting in the front passenger seat. When they arrived back at Parks's house, K.H. was parked out front; Ernest parked his car in the neighbor's driveway, because Parks lived in a double and two cars were on Parks's side. *Id.* at 320, 609, and 611-612.

{¶ 20} After Ernest parked, K.H. got out of his own car, opened the passenger side

door of Ernest's car, and tried to pull S.L. out. K.H. was mad. He hit S.L., and Heidi told him not to hit or smack her. K.H. then said, "Bitch, I'll smack you, too," to which Heidi responded, "Now you tripping." During the struggle, S.L. put her foot on Ernest's door as a brace, and Ernest told K.H. to let her out, as her shoe was damaging his door. K.H. then let S.L. out of the car, and she ran toward the plaza where Deja Brew was located. *Id.* at 330, 612-613, and 615-616. Ernest also exited the car, and he and K.H. had a confrontation at the back of the car. *Id.* at 660. At that point, Parks was in the house. When Ernest and K.H. stopped arguing, everyone began to go inside. As Heidi was going inside, Parks came out with a gun in his hand and said, "What's up." Heidi then said, "The dude tripping, telling me he's going to smack me," and Parks responded, "Oh yeah, he tripping." *Id.* at 616- 617 and 660.

{¶ 21} On July 3, 2021, D.M. and his girlfriend lived in the other side of the duplex where Parks and Heidi lived. That evening, D.M. was sitting outside in his front yard listening to music and saw K.H. pull up and park his car. D.M. knew K.H. but did not know Parks's brother, Ernest. K.H. did not get out of his car. D.M. then went to his backyard and was talking to his girlfriend when he heard Parks outside talking wildly and getting wilder and wilder, like he was arguing with someone. D.M. heard two male voices; Parks's tone was angry and his volume was loud. *Id.* at 347, 348, and 357.

{¶ 22} At the same time, another neighbor, K.C. was at her caretaker's house, which was across the street from Parks's house. K.C. had lived on Valencia Street for seven years, just down the street. She knew Parks, Heidi, K.H., and Ernest, but had seen Ernest more often because he was friends with someone she knew. K.C. also

knew that Parks and Heidi had gotten married a few months earlier, as her best friend was Heidi's cousin and she had seen them taking wedding pictures in the street. Tr. at 240, 243, and 261-262.

{¶ 23} K.C. was sitting by the front door of her caretaker's house when her attention was drawn by arguing. She heard male and female voices. K.C. saw Parks and two other males outside. She also saw Heidi and another taller, brown-haired girl. K.C. knew Parks, Heidi, and K.H., and she could identify their voices *Id.* at 245 and 248-249. At that time, K.H.'s voice was mad and loud, Heidi's voice was angry and almost loud, and Parks's tone was very angry. His volume was loud. She heard K.H. say, "I told you, mother effer." *Id.* at 250. She next heard pushing; K.H., Parks, and Heidi were pushing. K.C. then saw Parks pull out a gun and shoot K.H. in the face. After Parks shot K.H., he was standing over K.H. saying, "I told you. I told you." K.C. did not call the police because she was scared. *Id.* at 251 and 257-259.

{¶ 24} During the same time frame, D.M. went upstairs and looked out the bedroom window. He could hear Parks arguing. Parks was getting louder and louder. D.M. went downstairs and still heard them arguing. He then went back upstairs, and he and his daughter were looking out the window. D.M. heard Heidi say, "No, Dana," in a loud voice and heard a gunshot. At that point, D.M. saw Parks walk up the street holding a gun in his hand, down by his side. Parks came right back and threw the gun into a black SUV that was parked in front by the mailbox. *Id.* at 360-361.

{¶ 25} According to Ernest, after their initial confrontation, he and K.H. went inside and then K.H. wanted to go back outside. After they went out, they continued to argue.

Ernest was face to face with K.H.; neither had weapons, and Parks was standing at the corner of the house. K.H. was waving his hands around and got shot. When Ernest looked to see where the shot came from, Parks had a gun in his hand. Parks then walked down the street with the gun, and when he came back, Ernest did not see the gun. There was no point to call for an ambulance as K.H. was dead; there were no signs of life. There was blood on the cement. Tr. at 620-625 and 660-661.

{¶ 26} K.C. (the witness across the street) testified that, after K.H. was shot, Parks and Ernest picked up the body and put it in a deep maroon car. She could not tell if they put it in the trunk or the back of the car, as both doors were open. She saw headlights, and the car was leaving. *Id.* at 252-253. Ernest also testified that they put K.H. in the back of K.H.'s car, pulled around the corner, and parked the car in the back of some apartments. One of them drove the car and the other followed in a black car (apparently Ernest's black Tahoe). They then came back to Park's house and all talked about getting rid of the evidence. The blood needed to be cleaned up, and Parks also had a door camera. *Id.* at 626-628. At that point, Ernest drove home and returned with another vehicle, a white pickup truck.

{¶ 27} According to forensic cell phone evidence, the cell phones of K.H., Parks, and Ernest were all in the vicinity of Valencia Street between 3:04 a.m. and 3:06 a.m. on July 4. The last outgoing user input from K.H.'s phone was at 3:00 a.m. *Id.* at 747, 757-762, and 774. Between 3:41 a.m. and 3:58 a.m., Ernest's cell phone moved from the Valencia area to Military Blvd. Around 4:30 a.m., his cell phone was no longer at Military, and there were no more records for that phone until 6:54 a.m. *Id.* at 762-768.

{¶ 28} In the meantime, Parks's neighbor, L.W., was awakened around 4:00 a.m. by banging on the door. When she responded, Parks asked her to open the door, but she refused. She later discovered a bag on her roof, which was found to contain a box of .40 caliber bullets. (These bullets were consistent with the bullet obtained from K.H.'s body.) Parks told Ernest that he had thrown the bag on L.W.'s roof. Tr. at 291, 297-299, 402-404, 417, 420, 494-495, 647, 810, and 811. Parks also told Ernest he had thrown the gun in the sewer. Id. at 647.

{¶ 29} When Ernest got back to Parks's home, the doorbell camera was gone. Id. at 632. They discussed the fact that K.H.'s car was too close to the house, so they went to get it. Ernest then drove the car with the body in it, and Parks drove the white truck. They did not have a plan where to go, but once Ernest began driving, he figured out where he was going to go. He had previously lived in an area in Greenwich Village (an area on the west side of Dayton) that he knew had all-terrain vehicle (ATV) trails, so they drove there. Parks waited on the street while Ernest drove down a ravine into a wooded area. Id. at 634-635.

{¶ 30} At that point, Ernest expected Parks to wait because Parks did not know if Ernest was going to walk out on foot or drive the car out. When Ernest got down to the woods, he pulled K.H. out of the car and laid him down. K.H.'s identification and cell phone fell out, so Ernest picked them up and placed them on the body. As Ernest was about to leave, he saw a gas can. He then sprinkled gas around the body and set it on fire to make sure his DNA was not on the body, and he recognized the possibility that the identification would burn, too. Parks and Ernest had not discussed getting rid of the

body; their intent was to get the body away from Parks's location so the police did not come looking for him. *Id.* at 636-638.

{¶ 31} Ernest took the gas can with him. He was able to get K.H.'s car out of the ravine, and he and Parks then drove to Westside Auto Wreckers, a junkyard with which Ernest was familiar. Ernest parked the car in an alley next to the junkyard and used the gas to set it on fire. Parks was sitting there when Ernest set the car on fire and watched him do it. Ernest and Parks then left. Tr. at 641-643 and 683.

{¶ 32} On July 4, 2021, a teenager riding his father's ATV in the woods spotted a body at around 11:00 a.m. or 12:00 p.m., and the police were called. *Id.* at 392-395. Due to identification left at the scene, the police had an idea of who the victim was. They were able to obtain an address on Valencia (the house where Parks lived) by running a name found on a debit card near the body. They also found potential family and obtained information about where the family had last seen K.H. and about what vehicle he drove, which was a red Buick LaCrosse. At the time, the police had no idea that the murder had occurred at Parks's address, but they went there on July 4 to see if they could make contact with someone who knew K.H. The police spoke to Parks the day the body was discovered. At that time, Parks said K.H. had been down the street from his house the night before around 2:30 or 3:00 a.m. and had gotten into an argument with S.L., who ran off on foot. He further said that K.H. took off after S.L. in his car and that was the last time he had seen or heard from him. When the police told Parks they had found a body that was possibly K.H., Parks began crying and yelling and punched a tree. *Id.* at 423, 792-796, and 842.

{¶ 33} Westside Auto discovered the car on July 6, 2021, and notified the police. *Id.* at 529-532. Through video camera evidence, the police were able to identify the owner of the white pickup truck that had accompanied the red LaCrosse to the junkyard. As a result, the police talked to Ernest on July 7. *Id.* at 533-538, 545-546, and 805. After that conversation, during which Ernest said he did not want to talk but wanted the police to know he had not shot anyone, Ernest was arrested and charged with murder. The charges were dismissed after 48 hours, but Ernest remained in jail due to a parole violation. *Id.* at 645 and 833-836,. Based on contact with Ernest on July 7, the police had information that Parks had some involvement in the murder. They therefore returned to Park's address on July 8, 2021, obtained a search warrant, and searched the home. Eventually, further investigation occurred, and Ernest also made a proffer implicating Parks in October 2021. Parks was then indicted for the murder and other charges in December 2021. *Id.* at 551, 651, 805, 809-811, and 837-839.

{¶ 34} As noted, the trial court granted Parks's motion for acquittal of charges of abusing a corpse and the related arson because there was no evidence that Parks knew Ernest intended to set the victim's body on fire; thus, there was no evidence that Parks aided and abetted in those crimes. Tr. at 879-880. However, the court rejected the acquittal motion on the attempted arson charge related to K.H.'s car.

{¶ 35} In discussing these matters, the court referred to the complicity statute. *Id.* at 879. The court also instructed the jury that to be guilty of a crime, an individual may be the principal offender or may have "aided or abetted one or more individuals in committing an offense or offenses knowing that he was facilitating the offense charged in

the indictment. This is known as complicity." *Id.* at 931-932. The court's instruction was consistent with R.C. 2923.03(A)(2), which provides that: "No person, acting with the kind of culpability required for the commission of an offense, shall . . . [a]id or abet another in committing the offense."

{¶ 36} The court further told the jury that: "An aider or abettor is a person who knowingly aids, helps, assists, encourages, or directs himself with another person or persons to commit an offense. An aider or abettor is regarded as if he were the principal offender and is just as guilty as if he personally performed every act constituting the offenses." *Id.* at 932. This was consistent with the definition of aiding and abetting used by the Supreme Court of Ohio. *E.g., State v. Johnson*, 93 Ohio St.3d 240, 243 (2001).

{¶ 37} During the jury instructions and, in particular with reference to the attempted arson charge, the trial court also said: "The State argues that the act or failure to act of the Defendant caused or created a substantial risk of physical harm to property. Cause is an essential element of the offense. Cause is an act or failure to act, which in a natural and continuous sequence, directly produces the physical harm to property, and without which it would not have occurred." Tr. at 959.

{¶ 38} In arguing that insufficient evidence of his complicity existed, Parks notes that he was merely present at the scene of the car fire. Parks Brief, p. 5. In *Johnson*, the court noted that " 'the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' " *Johnson* at 243, quoting *State v. Widner*, 69 Ohio St.2d 267, 269 (1982). However, the court

qualified its statement by stressing that "[t]his is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission." That was not the situation here.

{¶ 39} From the moment the murder occurred, Parks's focus was to conceal and destroy all evidence that could connect him to the crime. He was not present at the junkyard as an innocent bystander. Parks followed Ernest to the junkyard and watched while Ernest set the fire. He could have acted to stop it but did not do so. This situation was quite different from what occurred at the scene where the body was burned, as there was no evidence that Parks knew about or saw anything connected with that fire. In fact, that would not have been possible, since Ernest testified that he used a gas can he found in the woods.

{¶ 40} Parks's second point under this assignment of error is that the finding about the value of K.H.'s vehicle was unsupported by the evidence because the only evidence of value came from Detective House, who was not an automobile expert. As noted, the crime's degree was elevated from a misdemeanor to a felony because the car's value was found to be more than $1,000. *See* R.C. 2909.03.02(D)(2)(a) and (b).

{¶ 41} Under R.C. 2909.11(A), "When a person is charged with a violation of division (A)(1) or (B)(1) of section 2909.03 of the Revised Code involving property value or an amount of physical harm of one thousand dollars or more . . . the jury or court trying the accused shall determine the value of the property or amount of physical harm and, if a guilty verdict is returned, shall return the finding as part of the verdict." The statute does not require the jury "to find or return the exact value or amount of physical harm" but

does set forth criteria that "shall be used" in determining the value of the property or physical harm.   R.C. 2909.11(A) and (B).

{¶ 42} In this vein, the statute provides three sets of criteria.   The first, in R.C. 2909.11(B)(1), is for heirlooms and does not apply here.   The remaining criteria are as follows: "If . . . the physical harm is such that the property can be restored substantially to its former condition, the amount of physical harm involved is the reasonable cost of restoring the property"; or, if "the physical harm is such that the property cannot be restored substantially to its former condition, the value of the property, in the case of personal property, is the cost of replacing the property with new property of like kind and quality."   R.C. 2909.11(B)(2) and (3).

{¶ 43} Detective House testified that K.H.'s vehicle was a 2014 Buick LaCrosse four-door sedan that appeared to be in "good operable condition" other than the burn damage.   House further stated that the vehicle's value was "significantly more" than $1,000.   *Id.* at 821.   There was no question that the vehicle was operable, even though it was missing a battery, because Ernest had driven it to the junkyard only a few days before it was found.   There was also no evidence that the vehicle could not be substantially restored to its former condition.   As a result, R.C. 2909.22(B)(2) applied, and the State was required to establish the "reasonable cost of restoring the property." House's testimony that the vehicle's value was more than $1,000 was irrelevant to the cost of repair.

{¶ 44} In arguing that it provided sufficient evidence, the State cites *State v. Williams*, 2006-Ohio-4653 (2d Dist.).   State's Brief, p. 16.   According to the State, the

evidence was sufficient because, in addition to House's testimony, it presented other evidence about the vehicle's condition. Specifically, J.H. testified that she had walked K.H. to his car when he left her house at around 11:00 or 12:00 the night of the murder, and there was no damage to the front quarter panel and no smoke or fire damage inside. She also said that K.H. kept his car in pretty good condition. Tr. at 320-321.

{¶ 45} In *Williams*, we found that photographs of a vehicle could reasonably let the jury find that its damage "would require a substantial amount of money to repair." *Id.* at ¶ 24. We subsequently distinguished *Williams*, noting that the jury could find from the photographs alone in *Williams* that the damage was more than $500. However, in the case then before us, "a reasonable finder of fact, based solely upon these photographs, would not be warranted in finding, beyond reasonable doubt, that the cost of repairing the damage depicted therein equals or exceeds $500." *State v. Hunter*, 2007-Ohio-5370, ¶ 14 (2d Dist.). In contrast, in a case the State has also cited, the Eighth District Court of Appeals found, based on testimony and photos, "that rational jurors could determine from these photos that the cost to repair the vehicle was $1,000 or more." *State v. Stubbs*, 2024-Ohio-839, ¶ 40 (8th Dist.), citing *Williams* at ¶ 24.

{¶ 46} Here, the jury could reasonably have found that more than $1,000 in damage occurred. There was no apparent damage to the vehicle before the murder. When the vehicle was found, there was a large amount of soot inside the interior. Tr. at 472-475, 480, and 821. Furthermore, while there was smoke damage to the car which might have been possible to clean, the back seat had also been set on fire. A reasonable inference was that the seat would have to be replaced. Under the circumstances, the

jury could have reasonably found that the car sustained more than $1,000 in damage.

{¶ 47} Based on the preceding discussion, the first assignment of error has no merit and is overruled.

### III.   Admission of Photographs

{¶ 48} Parks's second assignment of error states that:

The Trial Court Plainly Erred When It Allowed the Jury to Review Gruesome and Duplicative Photographs from the Autopsy and Crime Scene.

{¶ 49} Under this assignment of error, Parks argues that, because the cause of death was not in reasonable dispute, the trial court erred in allowing the jury to see gruesome photos of the crime scene and autopsy that had no connection to K.H.'s death. Parks also contends that even if the autopsy photos were appropriate, they were cumulative and identical to photos from the crime scene.

{¶ 50} "Under Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court."   *State v. Maurer*, 15 Ohio St.3d 239, 264 (1984). "Properly authenticated photographs, even if gruesome, are admissible . . . if relevant and of probative value in assisting the trier of fact to determine the issues or . . . illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number."   *Id.* at 239, paragraph seven of the syllabus.

{¶ 51} Notably, failure to object at trial to exhibits, including photographs, forfeits

error other than plain error concerning those exhibits. *State v. Trimble*, 2009-Ohio-2961, ¶ 132, citing *State v. Twyford*, 94 Ohio St.3d 340, 358 (2002); *see also State v. Rogers*, 2015-Ohio-2459, ¶ 21 (remarking that "forfeiture is the failure to timely assert a right or object to an error"). Here, Parks failed to object at trial when the photographs of the crime scene and autopsy were discussed, and he also did not object to the admission of any of the photos he now questions. *See* Tr. at 288-302, 455-461, 464, 467, 518-526, and 858-870. Therefore, our review is for plain error only.

{¶ 52} "Under the plain-error doctrine, intervention by a reviewing court is warranted only under exceptional circumstances to prevent injustice." *State v. Bailey*, 2022-Ohio-4407, ¶ 8, citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. To prevail under this doctrine, a defendant must show " 'an error, i.e., a deviation from a legal rule' that constitutes 'an "obvious" defect in the trial proceedings.' " *Rogers* at ¶ 22, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). However, "even if the error is obvious, it must have affected substantial rights," meaning that the defendant "is therefore required to demonstrate a reasonable *probability* that the error resulted in prejudice – the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis in original.) *Id.*, citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81-83 (2004).

{¶ 53} Furthermore, "even if an accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it"; instead, the Supreme Court of Ohio has admonished " 'courts to notice plain error "with the utmost caution, under exceptional circumstances and *only* to prevent a manifest

miscarriage of justice." ' " (Emphasis in original.) *Id.* at ¶ 23, quoting *Barnes* at 27, quoting *Long* at paragraph three of the syllabus.

**{¶ 54}** Even if we found an obvious error (which we do not), there would be no reasonable probability that it affected the outcome of the trial court proceedings. The evidence against Parks was overwhelming. Not only did Parks's brother implicate him, one neighbor saw him shoot the victim and another saw him walking from the scene with a gun in his hand. Furthermore, Parks does not suggest how the outcome of the proceedings would have been different, other than suggesting the photos served no purpose other than to inflame the jury. Parks's Brief at p. 8-9.

**{¶ 55}** As the State notes, the coroner who testified stated that the autopsy photos and x-rays (Ex. 11-20) would assist in his testimony. Tr. at 288. Furthermore, the murder was not the only crime involved; the State also had to prove that the victim's body had been burned and how that occurred. The photos at the crime scene aided in establishing these facts. In addition, our review of the transcript (as well as the photographs in question) reveals no evidence that the jury was inflamed. Certainly, viewing photos of murder victims was unpleasant. However, the jury actually indicated at one point during deliberations that it was deadlocked on four of the eight counts. Tr. at 974. Had the jury been inflamed or acting out of passion, such a deadlock would have been unlikely.

**{¶ 56}** In any event, for the reasons stated, this case does not present the type of exceptional circumstances warranting reversal based on a manifest miscarriage of justice. As we said, the evidence against Parks was overwhelming. Accordingly, the

second assignment of error is overruled.

## IV.   Ineffective Assistance of Counsel

{¶ 57} Parks's third assignment of error states that:

Parks' Defense Was Prejudiced by Ineffective Assistance of Counsel

for Failure to Move for a Mistrial.

{¶ 58} Under this assignment of error, Parks contends that trial counsel acted ineffectively by failing to ask for a mistrial when a juror reported that she and "another juror heard a bystander try to influence them to find Parks guilty."   Parks's Brief at p. 9.

{¶ 59} Allegations of ineffective assistance of trial counsel are reviewed "under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which was adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136 (1989)." *State v. Gillilan*, 2024-Ohio-4603, ¶ 51 (2d Dist.).   "To establish ineffective assistance, [a defendant] must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different."   *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at 136, paragraph two of the syllabus.   Having reviewed the record, we find no deficient performance by counsel nor any reasonable probability that but for the alleged error, the trial outcome would have been different.

{¶ 60} On the third day of trial, a juror reported that on the prior evening, she may have come in contact with persons who were spectators in the courtroom.   Tr. at 725.

As a result, the court conducted a voir dire of the juror, who first stated that she did not even know if the persons in question had been spectators, as she had not looked at anyone in the courtroom other than those within the active court, nor did she speak to these persons. *Id.* The following exchange then occurred.

The Court: Okay. But these people appeared to have some knowledge about this trial? There – is there –

[Juror]: Well, we didn't speak. At some point, I heard them speaking, and it was, I believe, directly related to this trial.

. . .

The Court: Okay. You – can you tell us what they said?

[Juror]: I heard one word. It was "guilty."

The Court: All right. Okay. And can you lay out [for] me – how far out were these people?

[Juror]: Okay. Looking at this parking lot – I think this is our parking lot?

. . .

The Court: The normal juror parking lot at –

. . .

The Court: East lot where you would have parked.

. . .

[Juror]: Okay. Right there. Those things with the yellow tips. I was parked kind of beyond that to the right – right hand side. . . .

. . .

[Juror]: And . . . I came through the little gate, and I was kind of walking almost directly straight, kind of back to that. And most of the jurors were kind of heading right to me. And there was people standing next to maybe that last little pole there with the yellow top, two females were standing there.

. . .

The Court: . . . So maybe they were . . . about 50 yards from you, would you say?

. . .

The Court: -- they weren't really close?

[Juror]: Not at that time, no –

. . .

. . . So I got to my car, I was on the passenger side putting things into my car.

. . . And I didn't hear anything around me. I know there were a couple of male jurors behind me kind of talking and chattering.

. . .

[Juror]: And so I was putting my stuff in my car. And at that point, . . . before I put my head up, after putting things into my car, that's when I heard a female voice – it felt like it was directed towards me – saying "guilty." I don't know if there were words said before that or after that.

. . .

But I didn't hear them say anything before or after that but I did hear that word.

. . .

[Juror]: And that's all that it occurred. I looked at them because I put my head up, like, I was shocked to hear that being –

. . .

[Juror]: said.

Tr. at 725-728.

**{¶ 61}** After hearing this comment, the juror got into her car and left. *Id.* at 729. During the voir dire, the juror also said she could put this matter out of her mind and decide the case based on what occurring during the courtroom. *Id.* at 730.

**{¶ 62}** The trial court then allowed both counsel to speak to the juror. During the prosecutor's questioning, the juror stated she did not know the comment was directed to her and did not know if she could recognize the persons' faces. *Id.* at 731-732. The prosecutor also told the juror that additional security would be walking the jurors out; the juror responded that this would help alleviate concerns. *Id.* at 732. In response to defense counsel's questions, the juror said she did not think she was in any physical danger and again stressed that she could base deliberations only on what was presented in the courtroom. *Id.* at 732-733. The juror further told the court that she wanted to continue to serve and felt she could do her job as a juror. *Id.* at 733.

**{¶ 63}** Contrary to Parks's contention, there was no evidence that another juror

heard what occurred. In fact, the juror being interviewed said that while another juror was directly behind her and had said he had seen the people, he did not mention hearing anything. The juror being interviewed also said she made sure not to say anything to him about what she had heard. *Id.* at 734-735. After the juror was excused, defense counsel stated that he did not want to make a move to excuse the juror, as "she made clear in all of her answers, she's still able to remain fair and impartial." *Id.* at 735-736.

{¶ 64} "The Sixth Amendment guarantees a defendant the right to trial by an impartial jury." *United States v. Lanier,* 988 F.3d 284, 294 (6th Cir. 2021). "When a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communication biased the juror." *State v. Phillips*, 74 Ohio St.3d 72, 88 (1995), citing *Smith v. Phillips,* 455 U.S. 209, 215-216 (1982), and *Remmer v. United States*, 347 U.S. 227, 229-230 (1954). The trial court complied here by questioning the juror about the communication and letting counsel participate.

{¶ 65} Trial courts also have broad discretion in deciding if a mistrial is warranted, and "the complaining party must show actual prejudice . . . , i.e., he must show that the communication biased one or more jurors." *State v. Herring*, 94 Ohio St.3d 246, 259 (2002), citing Crim.R. 33(A) and *State v. Keith*, 79 Ohio St.3d 514 (1997).[2] Parks does not suggest how communication of one word on one occasion (when the juror was not

---

[2] The Sixth Circuit Court of Appeals has said it is "the only circuit that places on the defendant the burden of proving bias at the *Remmer* hearing rather than requiring the Government to show 'that an unauthorized contact was harmless.' " *Lanier* at 295, quoting *United States v. Zelinka*, 862 F.2d 92, 95 (6th Cir. 1988). *Accord Cunningham v. Shoop*, 23 F.4th 636, 662 (6th Cir. 2022). Ohio courts have followed the Sixth Circuit approach. *E.g., State v. Sheppard*, 84 Ohio St.3d 230, 233 (1998); *State v. Conway*, 2006-Ohio-791, ¶ 160; *State v. Nashe*, 2024-Ohio-3400, ¶ 52 (8th Dist.); and *State v. Adams*, 2024-Ohio-2487, ¶ 48 (7th Dist.).

even certain it was directed toward her) caused actual prejudice. *Compare State v. Stallings*, 89 Ohio St.3d 280, 296 (2000) (person told jurors outside courtroom two or three times that " 'nothing short of the death penalty would be satisfactory' "; no prejudice was shown, as remark was momentary, was that person's personal opinion, and jurors said they would not be affected and would be impartial).

{¶ 66} The juror here said she was able to continue to be impartial and would base her decision only on what was presented in the courtroom. "A trial court may rely upon a juror's testimony as a basis for finding that her impartiality was not affected." *Herring* at 259, citing *Smith* at 217, fn. 7, and *Zelinka*, 862 F.2d at 95-96.

{¶ 67} Furthermore, " '[m]istrials need be declared only when the ends of justice so require and a fair trial is no longer possible.' " *State v. Knuff*, 2024-Ohio-902, ¶ 150, quoting *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). As an example, the Supreme Court of Ohio found in *Franklin* that a mistrial was not warranted where the trial court made an improper remark during a death-penalty hearing. This was based on the court's later explanation of its remarks and a curative instruction. *Franklin* at 127-128. In *Knuff*, the court also found an isolated and unclear reference to a polygraph test, while prohibited, was not grounds for a mistrial. *Knuff* at ¶ 149-155. The Supreme Court of Ohio has also affirmed denial of a mistrial where a state witness improperly mentioned the defendant's prior conviction in front of the jury. The court found no likelihood of prejudice based on overwhelming evidence of the defendant's guilt. *State v. Trimble*, 2009-Ohio-2961, ¶ 147-175.

{¶ 68} In the case before us, the trial court followed proper procedures, and there

was no basis for finding that Parks was prejudiced in any way. Trial counsel therefore did not render ineffective assistance of counsel. In addition, the evidence against Parks was overwhelming. Accordingly, the third assignment of error is overruled.

## V. Restitution Order

**{¶ 69}** Parks's fourth assignment of error states that:

The Trial Court's Sentence Ordering Parks to Pay Restitution Is Contrary to Law.

**{¶ 70}** Under this assignment of error, Parks contends that the restitution order was contrary to law because the trial court did not indicate that it considered his present or future ability to pay. During the sentencing hearing, the court ordered Parks to pay $2,220 to the victim's father for funeral expenses. Tr. at 990 and 1003. The court noted during the hearing that it had reviewed the presentence investigation ("PSI") report and had reviewed materials supporting restitution. *Id.* at 988-989. When the court imposed restitution, it did not make any specific findings concerning Parks's ability to pay. However, Parks did not object.

**{¶ 71}** Subsequently, the court filed an amended judgment entry ordering payment of $2,220 in restitution to the victim's father or the fiduciary of his estate, if the father were deceased. Amended Termination Entry (Feb. 16, 2024), p. 3. Again, the court did not make any specific findings about Parks's ability to pay.

**{¶ 72}** Because Parks failed to object in the trial court, we review this assignment of error only for plain error. "A defendant who does not dispute an amount of restitution,

request a hearing, or otherwise object waives all but plain error in regards to the order of restitution."   (Citation omitted.)   *State v. Snowden*, 2019-Ohio-3006, ¶ 88 (2d Dist.).   As indicated, courts take notice of plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."   *Long*, 53 Ohio St.2d 91, at paragraph three of the syllabus.   No such circumstances exist here.

**{¶ 73}** Before a trial court imposes a financial sanction under R.C. 2929.18, it must "consider the offender's present and future ability to pay the amount of the sanction or fine."   R.C. 2929.19(B)(5).   Restitution for a victim's economic loss is included in these sanctions.   See R.C. 2929.18(A)(1).   "However, '[t]he trial court does not need to hold a hearing on the issue of financial sanctions, and there are no express factors that the court must take into consideration or make on the record.' "   *State v. Hull*, 2017-Ohio-7934, ¶ 9 (2d Dist.), quoting *State v. Culver*, 2005-Ohio-1359, ¶ 57 (2d Dist.).

**{¶ 74}** "While it might be preferable, a trial court is not required to expressly state that it considered Defendant's ability to pay a fine."   *State v. Parker*, 2004-Ohio-1313, ¶ 42 (2d Dist.), citing *State v. Slater,* 2002-Ohio-5343 (4th Dist.). "The court's consideration of that issue may be inferred from the record under appropriate circumstances."   *Id.*   For example, a "court may comply with its obligation by considering a presentence investigation report . . . which includes information about the defendant's age, health, education, and work history."   (Citation omitted.)   *State v. Willis*, 2012-Ohio-294, ¶ 4 (2d Dist.).   *Accord State v. Kirchgessner*, 2022-Ohio-3944, ¶ 36 (2d Dist.); *State v. Moore*, 2019-Ohio-4806, ¶ 22 (2d Dist.).

**{¶ 75}** The PSI report indicated that the victim's family had requested $2,200 for

funeral expenses and that the funeral expenses had been forwarded to the court. PSI Report, p. 8. The report did not indicate that Parks had any health problems or disabilities. While the PSI did not discuss Parks's education or work history, the court was aware that Parks was 41 years old when he was sentenced and was also aware of his work history. Tr. at 1001.

{¶ 76} Specifically, while Parks was not employed at the time of sentencing (because he had been in jail), his motion for bond review stated that he had been employed at Energizer at the time of his arrest and that he was the main financial provider for his family. *See* Motion for Bond Reduction (September 13, 2022), p. 2. Another motion for bond reduction filed in February 2023 claimed that if Parks were released, he had a job waiting at the Energizer Factory in Dayton. Motion for Reduction of Bond (Feb. 22, 2023), p. 1. Although the court did not grant the bond motions, it was aware that Parks was able to work.

{¶ 77} It is true that Parks's sentence was long, but he received nearly two years of jail credit and would be around 62 years old if released at the end of the minimum 23-year term. We have held that " '[a] lengthy prison sentence does not necessarily preclude the imposition of financial sanctions.' " *State v. Harwell*, 2015-Ohio-2966, ¶ 69, quoting *State v. Western*, 2015-Ohio-627, ¶ 57 (2d Dist.). Here, the restitution amount was minimal, and we find no exceptional circumstances that would warrant finding a manifest miscarriage of justice. Accordingly, the fourth assignment of error is overruled.

VI. Double Jeopardy

**{¶ 78}** Parks's fifth assignment of error states as follows:

R.C. 2929.14(B)(1)(g) Violates the Double Jeopardy Protections Provided for in the U.S. and Ohio Constitutions.

**{¶ 79}** Parks argues that his sentence is contrary to law because the trial court imposed a sentence from a firearm specification on a merged charge consecutively to a definite term of incarceration. According to Parks, this violated the double jeopardy protection against imposition of multiple punishments for the same offense.

**{¶ 80}** The relevant facts are as follows. At sentencing, the trial court merged Counts One through Four, and the State elected to have Parks sentenced on Count One. Tr. at 993-994. The indictment alleged in Count One that Parks had caused K.H.'s death as a proximate result of committing or attempting to commit an offense of violence, i.e., felonious assault (deadly weapon), in violation of R.C. 2903.11(A)(2). Count Two alleged that Parks knowingly caused or attempted to cause physical harm to K.H. by means of a deadly weapon or dangerous ordnance in violation of R.C. 2903.11(A)(2). These crimes, respectively, were murder, an unclassified felony; and felonious assault, a second-degree felony. Both counts had firearm specifications alleging violation of R.C. 2929.14 and 2941.145.

**{¶ 81}** At the sentencing hearing, the court imposed a 15-year to life sentence on Count One and a three-year sentence for the firearm specification attached to that count, to be served prior to and consecutive to the 15-year term. Tr. at 1001. The court also imposed a three-year sentence for the firearm specification in Count II, even though that count had been merged, and ordered the three-year term to run prior to and consecutive

to the term for Count One. *Id.* The court noted this was required by *Bollar*, 2022-Ohio-4370. *Id.* This sentence was reflected in the judgment entry.

{¶ 82} Parks concedes that under *Bollar*, the Supreme Court of Ohio interpreted R.C. 2929.14(B)(1)(g) as allowing courts to impose consecutive sentences for specifications attached to merged offenses. However, Parks argues that *Bollar* did not address the double jeopardy aspects of the statute. Parks contends that R.C. 2929.14(B)(1)(g) conflicts with R.C. 2951.25, which protects an individual's constitutional right to be free from double jeopardy. Parks's Brief at p. 14-15. Parks therefore maintains that, in this situation, the statute protecting constitutional rights must prevail.

{¶ 83} "Among the protections of the Fifth Amendment to the United States Constitution is that no person 'be subject for the same offence to be twice put in jeopardy of life or limb.' The Ohio Constitution contains a similarly worded guarantee: 'No person shall be twice put in jeopardy for the same offense.' Ohio Constitution, Article I, Section 10." *City of Girard v. Giordano*, 2018-Ohio-5024, ¶ 6. The Supreme Court of Ohio reads "the double-jeopardy provisions as protecting against three distinct wrongs: '(1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense.' " *Id.* at ¶ 8, quoting *State v. Gustafson*, 76 Ohio St.3d 425, 432 (1996). The case before us involves the third wrong, i.e., whether Parks was improperly subjected to multiple punishments for the same offense.

{¶ 84} When Parks was sentenced, R.C. 2929.14(B)(1)(b) stated, in pertinent part, that: "Except as provided in division (B)(1)(g) of this section, a court shall not impose more

than one prison term on an offender under division (B)(1)(a) of this section for felonies committed as part of the same act or transaction."[3]   R.C. 2929.14(B)(1)(g) (the exception) provides that:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶ 85} As indicated, Count Two of the indictment charged Parks with a firearm specification in violation of R.C. 2929.14 and R.C. 2941.145.  This was a specification described under R.C. 2929.14(B)(1)(a).  In this context, R.C. 2929.14(B)(1)(a) states, in relevant part, that: "if an offender who is convicted of or pleads guilty to a felony also is convicted of or pleads guilty to a specification of the type described in section . . . 2941.145 of the Revised Code, the court shall impose on the offender . . . (ii) A prison

---

[3] R.C. 2929.14 was amended in 2024 (after sentencing), but the language in the provisions discussed here has not changed.  *Compare* Am. Sub. S.B. 288, 2022 Ohio Laws 160, eff. April 4, 2023, with Am. Sub. S.B. 106, 2024 Ohio Laws 19, eff. June 12, 2024.

term of three years. . . . " Therefore, under the statute, the trial court was required to sentence Parks to an additional three-year prison term for the firearm specification in Count Two, even though that count had been merged.

**{¶ 86}** Our court has not yet considered *Bollar*, which was decided in 2022. In that case, the Supreme Court of Ohio certified a conflict among districts and asked the parties to address this question:

> Whether Ohio's legislature has specifically authorized cumulative punishments for multiple firearm specifications that were committed as part of the same act or transaction under the narrowly tailored, specifically designated circumstances set forth in R.C. 2929.14(B)(1)(g), when the underlying felonies attendant to the firearm specifications are merged at sentencing as allied offenses of similar import pursuant to R.C. 2929.14(C)(4).

*Bollar*, 2022-Ohio-4370, at ¶ 7, quoting *State v. Bollar*, 2021-Ohio-2795.

**{¶ 87}** In addressing this question, the court reached several conclusions. First, the court found that R.C. 2929.14(B)(1) is unambiguous and should be applied as written. *Id.* at ¶ 10-13. The court then discussed the meaning of "convicted" as expressed in a prior case that involved R.C. 2941.25(A) (the statute that prohibits convictions for allied offenses). *Id.* at ¶ 14, citing *State v. Whitfield*, 2010-Ohio-2, ¶ 23.

**{¶ 88}** The court noted that *Whitfield* had defined "conviction" for purposes of R.C. 2941.25 as both a guilty verdict and sentence, which may create a "tension" with R.C. 2929.14(B)(1)(g). According to the court, this is because under R.C. 2929.14(B)(1)(g),

" 'convicted' can mean only 'found guilty'; it cannot be read to include that the offender's sentence has also been imposed, because that statute provides that a sentence will be imposed only if the offender is convicted (i.e., found or pleaded guilty)." *Bollar* at ¶ 15.

{¶ 89} To resolve this "tension," the court clarified that *Whitfield's* definition does not apply to R.C. 2929.14(B)(1)(g) and that it would instead use the plain meaning of "convicted," i.e., " 'found guilty.' " *Id.* at ¶ 16, quoting *Black's Law Dictionary* (11th Ed.2019). The court then concluded it was required to apply R.C. 2929.14(B)(1)(g)'s plain meaning, which is that a defendant is to receive prison terms for each of the two most serious specifications to which he or she pleads guilty. *Id.* at ¶19. The result would be the same where, as here, a jury has found the defendant guilty.

{¶ 90} The court also briefly addressed double jeopardy, stating that:

In requiring that offenders like Bollar be subject to separate prison terms for multiple firearm specifications, the General Assembly appears to have acknowledged that the use of firearms in certain violent crimes should carry a hefty penalty. As the Fifth District acknowledged below, double-jeopardy protections are not violated when the legislature specifically authorizes cumulative punishment. . . . Thus, while one could argue that common sense dictates that an offender should not be sentenced on a specification when the offender has not been sentenced on the underlying criminal offense, the General Assembly exercised its discretion in requiring that the sentence include separate prison terms for multiple specifications. This court defers to that legislative choice. If the General Assembly determines

that this should no longer be the law in Ohio, the legislature may use its discretion to amend R.C. 2929.14(B)(1)(g) to require a different approach. *Bollar*, 2022-Ohio-4370, at ¶ 20, citing *Bollar*, 2021-Ohio-1578, ¶ 25 (5th Dist.).

**{¶ 91}** Finally, the Supreme Court of Ohio found that R.C. 2941.25, a general statute, did not override R.C. 2929.14(B)(1)(g), which was later enacted and more specific. *Id.* at ¶ 21. The court therefore resolved the certified conflict in favor of the Fifth District and affirmed that court's imposition of the two firearm sentences. *Id.* at ¶ 25.

**{¶ 92}** Although the Supreme Court of Ohio mentioned double jeopardy only briefly, the Fifth District's discussion was more detailed. The court of appeals remarked that: "Both the Fifth Amendment to the United States Constitution and Section 10, Article I, Ohio Constitution, guard against successive prosecutions. Both provisions also guard against cumulative punishments for the same offense. R.C. 2941.25, allied offenses, was adopted by the General Assembly to effectuate these constitutional principles." *Bolla*r, 2021-Ohio-1578, at ¶ 24, citing *State v. Thomas*, 61 Ohio St.2d 254, 259-260 (1980), *overruled on other grounds by State v. Crago*, 53 Ohio St.3d 243 (1990).

**{¶ 93}** The Fifth District went on to stress that: " 'With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.' " *Id.* at ¶ 24, quoting *Missouri v. Hunter*, 459 U.S. 359, 366 (1983). Thus, because the Ohio legislature had authorized multiple punishments in "narrowly tailored, specifically designated circumstances set forth in R.C. 2929.14(B)(1)(g)," no double jeopardy issue existed. *Id.* at ¶ 25.

{¶ 94} According to Parks, *Hunter* was different because the legislature in that case provided for two punishments for the same conduct and "did not say anything about the situation in this case where punishment was imposed for a specification to a conviction that was merged into another one." Parks Reply Brief, p. 6. Parks therefore contends that, even if we conclude that the Supreme Court of Ohio considered double jeopardy, the court's decision was based on a misconstruction of the context in which *Hunter* was decided. *Id.* at p. 7. In our opinion, this argument presents a classic "distinction without a difference." In either situation, a legislature chose to impose multiple punishments for the same conduct.

{¶ 95} The Supreme Court of Ohio clearly considered the effect of double jeopardy in *Bollar* and found it did not preclude multiple punishments as set out in R.C. 2929.14(B)(1)(g). "Appellate courts are bound by and must follow decisions of the Ohio Supreme Court, which are regarded as law unless and until reversed or overruled." *Cooke v. Montgomery Cty.*, 2004-Ohio-3780, ¶ 39 (2d Dist.). As noted, the General Assembly amended R.C. 2929.14 after *Bollar* was decided and made no changes to the statute.

{¶ 96} Based on the preceding discussion, the fifth assignment of error is overruled.

## VII. Admission of Evidence

{¶ 97} Parks's sixth assignment of error states that:

The Trial Court Erred When It Allowed Evidence of an Old Casing

Found in Parks' Backyard and Box of Bullets Found in a Neighbor's Yard into Evidence.

**{¶ 98}** Parks contends the trial court erred in admitting evidence of a .40 caliber bullet casing into evidence because the casing was found on the handrail of Parks's back deck, was weathered, and could not have been from the bullet that killed K.H. because the shooting occurred in front of the home. In addition, Parks argues that the court improperly admitted evidence of a box of bullets found on a neighbor's roof.

**{¶ 99}** Because trial courts have broad discretion in admitting evidence, we review evidentiary decisions for abuse of discretion. *State v. Morris*, 2012-Ohio-2407, ¶ 14. An abuse of discretion "has been described as including a ruling that lacks a 'sound reasoning process.' " *Id.*, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).[4] This type of review is deferential, and "[i]t is not sufficient for an appellate court to determine that a trial court abused its discretion simply because the appellate court might not have reached the same conclusion or is, itself, less persuaded by the trial court's reasoning process than by the countervailing arguments." *Id.*

**{¶ 100}** As noted, Parks filed a motion in limine prior to trial seeking to exclude evidence about a .40 caliber bullet casing that had been found on the rear porch of his residence, and the court overruled the motion during trial. After the State rested, Parks

---

[4] In its brief, the State asserts that an abuse of discretion "connotes more than an error of law." State's Brief at p. 30. We have previously corrected this assertion, stressing that "the Supreme Court clearly stated in *Johnson* that trial courts are not free to make errors of law." *State v. Pulley*, 2023-Ohio-3277, ¶ 52, fn. 1 (2d Dist.), citing *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 38.

objected to admission of pictures of the casing and to admission of the casing itself. The court overruled the objections. Tr. at 863-865 and 869-870.

{¶ 101} The casing was discovered and collected during a search of Parks's home on July 8, 2021. *Id.* at 555-556 and 809-810. The casing's headstamp bore the initials "R-P" (which is the brand stamping for Remington) and "40 S&W" (which stands for Smith & Wesson). *Id.* at 491, 558-559 and 818. When the casing was collected, the police did not yet know that the bullet recovered from K.H.'s body was a .40 caliber. The police did not send the casing for testing as it was weathered. Det. House indicated that if the casing were connected to the crime, it had been exposed to the elements for some time, and it would not have gotten to the back porch by being fired in front of the house; someone would had to have picked up the casing and moved it. *Id.* at 817-818.

{¶ 102} Regarding the box of bullets, L.W., who also lived on Valencia, testified that around 3:00 a.m. on July 4, 2021, she was awakened by loud music that her neighbor, D.M., was playing. As a result, L.W. went to D.M.'s house and asked him to turn down the music, which he ultimately did. No one else was outside. L.W. then walked back to her house. She did not see a bag on her roof at that time. L.W. went back to sleep and was awakened around 4:00 a.m. by Parks's knocking on her door. At some later point, L.W. saw what looked like trash on top of her roof. *Id.* at 412-417 and 420.

{¶ 103} On July 9, 2021, L.W. called the Riverside police to report that she had found a bag on her garage roof and it contained ammunition. An officer responded and recovered the bag, which contained a box of Remington UMC pistol revolver cartridges.

The bullets were .40 caliber. Tr. at 402-407. The box of bullets was full, was Remington Brand ammunition, was labeled "40 S&W," and had the same headstamp as the .40 caliber bullet found on Parks's back porch. *Id.* at 818-819.

{¶ 104} The bullet removed from the victim's body was consistent with a .40 caliber bullet. *Id.* at 299 and 494-495. At trial, the State argued that the .40 caliber casing found on the porch was highly relevant because of the efforts to clean up the scene and because an expert had identified the bullet found in K.H.'s body as a bullet of that caliber. The casing thus linked the house where Parks was living with that type of bullet. The trial court agreed and overruled the motion in limine. *Id.* at 502-503.

{¶ 105} Parks did not object during testimony about the box of bullets but did object to admission of that exhibit at the close of the State's case. The State asserted that this evidence was relevant to the charge of tampering with evidence, and the court admitted the exhibit. *Id.* at 871.

{¶ 106} In view of the above facts, we find no abuse of discretion in admission of evidence pertaining to the bullet casing on the back porch or the box of bullets. Count Five of the Indictment charged Parks with tampering with evidence from Valencia, in violation of R.C. 2921.12(A)(1). This statute provides that: "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following: (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."

{¶ 107} After shooting K.H., Parks attempted to dispose of any evidence that would

link him to the crime, including throwing the gun in the sewer. Bullets of the same caliber as the one found in the body would have linked Parks to the shooting. If the box of bullets had not been found, the casing on the back porch was still evidence linking Parks to the type of bullet used in the murder. Therefore, evidence about both the casing and the box of bullets was very relevant.

{¶ 108} Parks also argues that there was no evidence, beyond circumstantial, that he placed the ammunition on L.W.'s roof. That is incorrect, as Ernest testified that Parks told him that he threw the bag containing bullets on D.W.'s roof and had to get them before the police came. Tr. at 647. Consequently, there was direct evidence, and finding the bag of bullets on the roof also corroborated Ernest's testimony. Furthermore, the Supreme Court of Ohio has stressed that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value. In some instances certain facts can only be established by circumstantial evidence." *Jenks*, 61 Ohio St.3d at 272. *Accord State v. Martin*, 2017-Ohio-7556, ¶ 112.

{¶ 109} Based on the preceding discussion, the sixth assignment of error is overruled.


VIII.    Conclusion

{¶ 110} All of Parks's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.